# McAuley and others' Appeal.

1. In the Reformed Presbyterian Church, the General Synod, its highest judicatory, is bound by its system of religious principles with the same force as individual members.

2. A congregation, organized and holding its property as a constituent part of any particular religious denomination, or in subordination to its government, which, without just cause, severs such connection or government, forfeits its rights and property to those who maintain the original status.

3. If such severance be alleged, the burthen is upon those alleging to show that the others voluntarily, by their own act and without sufficient cause, renounced their connection with the general organization and invaded the chartered rights of their fellows to the church property.

4. A Presbytery of the Reformed Presbyterian Church, deeming that acts of the Synod were in disregard of the constitutional rights and jurisdiction of the Presbytery, resolved to suspend its "relations to Synod until such action be revoked, or (it) obtain further light, and in the meantime remain in the Reformed Presbyterian Church," &c.   If the allegations were correct, the Presbytery was justified.

5. The resolution having been laid before Synod, it, without notice or trial, resolved that the officers and members of the Presbytery were out of

the jurisdiction of the Synod; and such officers and members of the Fifth Congregation (and others) who might not identify themselves with the act of Presbytery, &c., be declared the Fifth Congregation, &c.: *Held*, that this action of Synod did not unchurch the Fifth Congregation, &c.

6. By the Presbyterian polity, officers and members of a church cannot be unchurched by an arbitrary decree of Synod without notice or trial, although the admitted act complained of be contumacious and worthy of censure.

7. A Presbyterian congregation does not select its representatives to its higher courts; the pastor is a delegate by virtue of his office, and the lay representative is chosen by the Session; a congregation cannot be chargeable with the acts of its delegates.

8. The excision of the Presbytery could not work the deposition of officers in the church previously called and ordained.

9. Under its legislative powers Synod may dissolve a Presbytery and assign its churches to some other Presbytery; under its judicial powers, it may, for proper cause and in due form, depose a presbyter, dissolve churches and reorganize them.

10. A legislative act of Synod which forfeits the franchises and property of a congregation, is in the nature of a judicial sentence and inoperative; it is *ultra vires*.

11. Synod has no more power to exscind a church than a state legislature to exscind a county; the forfeiture of its rights by the church must be made to appear by a regular judicial decree.

12. The only constitutional method by which a congregation can express itself is by congregational meetings regularly called.

13. The decree of excision of the Synod amounted at most but to a dissolution of the original compact of union, leaving the several churches free to seek their own connections or to arrange themselves as might seem meet, provided they did not radically depart from the faith or doctrines under which they were organized.

14. Commonwealth *v.* Green, 4 Whart. 601, distinguished; Lutheran Congregation *v.* St. Michael's Church, 12 Wright 20; Schnorr's Appeal, 17 P. F. Smith 138; Presbyterian Congregation *v.* Johnston, 1 W. & S. 9; Winebrenner *v.* Colder, 7 Wright 244, referred to.

February 10th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from Nisi Prius: In Equity, No. 15, to January Term 1872.

The bill in this case was filed November 1st 1871.

The plaintiffs were Robert Steed, elder; John M. Buchanan, John Glenn, Thomas Miller, William Steen, James Creighton and William Reynolds, trustees; and William A. Buchanan, James McClean, Samuel McClay and James Kerr, members of "The Fifth Reformed Presbyterian Congregation in the District of Kensington in the county of Philadelphia;" the defendants were A. G. McAuley, James Dittie, Robert H. McMunn, Thomas McKeever, Samuel Lyons, Andrew Loughridge, Nathaniel Dittie, Joseph Caldwell, Robert Graham, Samson McDowell and Robert Spratt.

The Fifth Reformed Presbyterian Congregation above named, was incorporated by the Court of Common Pleas of Philadelphia on the 9th of March 1850.

The following are parts of the constitution:

Article 2. The subscribers and such others as shall hereafter become members of said congregation and who adhere to and maintain the system of religious principles declared and exhibited by Reformed Presbyterian Synod of North America (of which the Rev. Doctors Wylie and Crawford are now officiating members), shall be a corporation, &c.

Article 4. There shall be a board of trustees, which shall consist of not less than five members, who shall be recognised by the session of this congregation as being in full communion with the church.

Article 5. There shall be an annual election for the members of the board of trustees on the first Monday in January in every year, of which notice shall be given two weeks previous from the pulpit. The election shall be by ballot in the church.

Article 6. The persons electing or capable of electing shall be all who are in full communion with the congregation, as well as all pew-holders, though not in full communion.

The question raised by this case was, who were "The Fifth Reformed Presbyterian Church in the District of Kensington," &c.

The bill set out.

1. Plaintiffs were since January 1st 1868 and hitherto members of said congregation.

3. The corporation owned a valuable lot on York street, which, with church buildings erected on it, was worth about $25,000.

4. The congregation is a constituent part of "The Reformed Presbyterian Church in North America," which is governed by "The General Synod" of that church, by Presbyteries constituted by the Synod and subordinate to it; the Synod, being the body mentioned in article 2 of the constitution, is the chief legislative authority and supreme judicatory of the Reformed Presbyterian Church in North America, having appellate jurisdiction in all cases and original jurisdiction where it sees fit to assume it over the members of that church. Every person, as a condition of becoming a member, vows subordination to it.

5. The Fifth Congregation at the time of its organization was part of "The Reformed Presbytery of Philadelphia," afterwards known as the "First Reformed Presbytery of Philadelphia."

6. At a meeting of the Reformed Presbytery of Philadelphia, held the 12th day of June 1868, at which the Fifth Congregation was represented by A. G. McAuley and Robert H. McMunn, defendant's resolutions were adopted dissolving its connection with said Synod, McAuley and McMunn voting in their favor; and since then the Presbytery has sent no delegates to Synod, has taken no steps towards renewing its connection therewith, nor in any way acknowledged its subordination thereto, but has denied the authority of Synod and in every way acted independently of it.

7. At the annual meeting of the General Synod, held May 1869,

the Reformed Presbytery of Philadelphia was, in consequence of its action above-mentioned, declared by Synod to be without its jurisdiction. And it was enacted " that such officers and members of * * * the Fifth Congregation of Philadelphia, * * * who may not identify themselves with the act of secession of the Philadelphia Presbytery, but avow their adherence to the General Synod of the Reformed Presbyterian Church, be declared to be the * * * Fifth Congregation of Philadelphia, * * * under the care of General Synod, and the liberty is hereby given them to place themselves under the care of the Second Presbytery of Philadelphia, and that Presbytery is hereby, upon their application, authorized to receive them." And that the Presbytery known as " The Second Reformed Presbytery of Philadelphia," should be thenceforward designated as the Reformed Presbytery of Philadelphia.

8. At the annual meeting of the Fifth Congregation held the 1st Monday of January 1870, resolutions were introduced by the defendant R. H. McMunn, then an elder of said congregation, setting forth that whereas the said Fifth Congregation was not in connection with any organized religious body, and such a connection was desirable, it should be resolved that said congregation should unite with the body of Presbyterians at Pittsburg, which does not maintain the religious principles of the Reformed Presbyterian Synod of North America. No vote was taken, but at an adjourned meeting January 11th 1870, the " session" of the congregation, composed of the minister and elders, were instructed to take the vote of the congregation upon said resolution, and the defendants and the party in the congregation associated with them, supported said resolution.

9 and 10. The plaintiffs finding that the defendants and the party in the congregation associated with them, constituting a majority of the congregation, including the minister, A. G. McAuley, a majority of the elders, and all of the board of trustees, supported the action of the Presbytery set forth in paragraph 6, refused subordination to the Synod of the Reformed Presbyterian Church, and were endeavoring to convert the property of the congregation to uses contrary to the charter, &c.—associated themselves together with such other members of said congregation as dissented from the revolutionary proceedings of the majority, and adhered to the said General Synod, as " the Fifth Reformed Presbyterian Congregation in the District of Kensington in the county of Philadelphia," in accordance with the enactment of General Synod mentioned in paragraph 7, and petitioned the Reformed Presbytery of Philadelphia (formerly known as the Second Reformed Presbytery of Philadelphia) to be taken under its care, and were upon the 8th day of February 1870, received under the care of the Reformed Presbytery of Philadelphia, and are recognised by the General Synod; as the Fifth Reformed Presbyterian Congrega-

[McAuley's Appeal.]

tion; and as in due subordination to the Synod of the Reformed Presbyterian Church of North America, &c.

11. That William Reynolds, &c., are the trustees of the said Fifth Reformed Presbyterian Congregation, duly elected on the First Monday of January 1871.

12, 13 and 14. The defendants have voluntarily withdrawn from the Reformed Presbyterian Church in North America, and from the jurisdiction of its Synod, &c., and do not maintain the system of religious principles declared by the Reformed Presbyterian Synod of North America ; a part of the terms of its ecclesiastical communion to which every member of the church must subscribe, is " due subordination in the Lord to the authority of the Synod of the Reformed Presbyterian Church in North America," yet the defendants refuse all subordination to the authority of said Synod, and openly declare their independence of it ; and therefore the defendants have ceased to be members of " the Fifth Reformed Presbyterian Congregation," &c.

15. The defendants hold possession of the church buildings, furniture and other the property of the said Fifth Reformed Presbyterian Congregation, and refuse to deliver the same to the trustees of the said congregation.

16. The defendant A. G. McAuley unlawfully exercises the functions of minister, and the defendants, Dittie, McMunn and McKeever, unlawfully exercise the functions of elders within the church buildings, &c.

17 and 18. Those of the defendants unlawfully claiming to be trustees of said congregation, are proceeding to erect buildings upon the lot of ground and endeavoring to create liens and encumbrances thereon, &c., and will, unless restrained, appropriate the property of the Fifth Reformed Presbyterian Congregation to the use of a religious body which does not maintain the system of religious principles of the Reformed Presbyterian Synod of North America.

The prayers for relief were :

1. That plaintiffs be declared to be " the Fifth Reformed Presbyterian Congregation," &c.

2, 3, 4 and 5. That the defendant A. G. McAuley be enjoined from exercising the functions of minister, and the other defendants respectively from exercising the functions of elders and trustees of the said congregation, and from dealing with the property thereof, and be decreed to deliver it to William Reynolds, &c., or their successors, trustees of said congregation.

The defendants answered :

1. The Fifth Reformed Presbyterian Congregation, &c., was organized in 1849 as a constituent part of the Reformed Presbyterian Church of North America, the religious principles, powers and jurisdictions of whose judicatories are set forth in several

27 P. F. SMITH—26

books named in this paragraph.  On March 14th 1850, Henry
Norris conveyed to the corporation, for $1, the lot mentioned in
plaintiffs' bill, " to and for the only and proper use and behoof of
said congregation, their successors and assigns for ever."  The
corporation shortly afterwards erected a church building, which
was torn down in June 1868, when they began to erect a more
commodious one, which is not yet completed.  In June 1850, a
pastor was chosen, who shortly resigned, and in 1853, the defend-
ant (McAuley) was installed pastor.  The congregation, under his
pastoral care, has increased from thirty to more than four hundred.
The General Synod, at its session in Pittsburg in May 1868, took
certain action which was *ultra vires*, part of which was that the
Synod admitted the delegates of the Second Reformed Presbytery,
which was not a Presbytery authorized by the Synod; one delegate
was admitted from that Presbytery, belonging to a congregation
under the jurisdiction of the Reformed Presbytery of Philadelphia.
The Synod suspended George H. Stuart, a ruling elder, without
any judicial forms and in disregard of the directions of the Book
of Discipline ; it revoked the suspension of A. McMurray and R.
Guy, as elders, there having been no appeal from the Presbytery,
Synod having no original jurisdiction, and their case being then
before the session of the First Reformed Presbyterian Church ; it
appointed a commission on the affairs of the First Church, which was
an arbitrary assumption of jurisdiction of a case pending in a
lower court—The Reformed Presbytery, under whose care the
Fifth Reformed Congregation has been from its organization.
The Reformed Presbytery, in consequence of the aforesaid action,
on the 12th of June 1868, adopted the preamble and resolutions
following :

Resolved, That we regard the proceedings of Synod as afore-
said to be contrary to the standards of the Reformed Presbyterian
Church, to its book of discipline, to its terms of communion, to its
formula for ordination, to numerous acts upon its records, and that
a true and faithful adherence to the principles of the church, and
to our solemn vows, and especially our paramount obedience to the
Lord Jesus Christ, the great and only King and Head of the
Church, will not allow us to recognise the unconstitutional, dis-
orderly, arbitrary and injurious action of said Synod as aforesaid,
and we do therefore hereby suspend our relations to said Synod
until such action be revoked, or until we obtain further light, and
in the meantime we remain in the Reformed Presbyterian Church,
maintaining her organization, and endeavoring to develope and
apply her principles in their proper application to the age and
country in which we live, trusting that ere long those who have
disregarded her constitution and her laws, and have perverted her
order and her discipline, will rescind their illegal acts and concur
with us in the views we have thus announced.

[McAuley's Appeal.]

Resolved, That the Presbytery regards the action of Synod in restraining and prohibiting it from considering or issuing any case now pending before it, or which may hereafter be brought before it relating to the existing difficulties in the First Reformed Presbyterian Church, Philadelphia, as unconstitutional, unjust, arbitrary, subversive of our just rights, duties and privileges as a Presbytery, and highly dishonoring, and that we decline to recognise or submit to it.

Resolved, That the inquiries addressed to this Presbytery by the session of the First Reformed Presbyterian Church, Philadelphia, be answered as follows:

1. The suspension of George H. Stuart is totally invalid, and not to be in the least degree regarded.

2. The revocation of the suspension of Dr. A. S. McMurray, and R. Guy, is entirely irregular, and no attention to be paid to it.

3. The action of Synod in regard to the list of voters is of no account whatever.

4. The appointment of a commission in the circumstances was unconstitutional, invalid, irregular, subversive of the just rights of Presbyteries, sessions and congregations, and a great disrespect to the Presbytery, and no attention should be paid to any of its proceedings.

5. The action of Synod in suspending and restraining the session from judicial functions in this matter, is wholly irregular and unwarranted, and is not to be regarded.

The commission met in Philadelphia, and sat from the 17th to the 20th of June 1868, and amongst other things declared the Reformed Presbytery of Philadelphia to be without the jurisdiction of General Synod of the commission. This Presbytery, on the 17th of May 1869, adopted a memorial, &c., to the General Synod, stating that they considered the action of the last meeting of Synod not warranted by the Word of God, in violation of the standards of the Reformed Presbyterian Church, and subversive of the just jurisdiction and authority of the Presbytery; they called attention of Synod to the action of the commission which was appointed only to adjust the difficulties in the First Church, and yet assumed authority over this Presbytery, and without sufficient information of its proceedings declared that it had seceded from the "control of Synod, declined its authority, and withdrawn from its jurisdiction;" together with other grievances specified. The memorial prayed the Synod to condemn and annul the proceedings of the commission.

The memorial proceeded:

" From these considerations we have felt, fathers and brethren, deeply aggrieved, and while we have not withdrawn from the Reformed Presbyterian Church nor sought connection with any other

ecclesiastical organization, we have 'suspended our relations' in the form and manner alleged in the document we have herewith transmitted.   We love the Reformed Presbyterian Church, and we have earnestly labored to sustain and extend her influence in the support of the Redeemer's kingdom.   In no part of the world where she exists has she been more flourishing than within our bounds until our peace has been disturbed by an attempt made within a few years past to exercise a constraint in regard to psalmody and communion not required by our standards and previously unknown. * * * Until two years ago no protest or appeal from any one under our jurisdiction appeared upon your records. To suggest the causes which have produced the change which has taken place is not our design.   We leave the men, who have disturbed our peace, and their motives to the scrutiny and judgment of an omniscient and holy God.   As regards ourselves, we occupy a position which we believe to be required by the divine law and by the proper interpretation and application of our standards, and we have felt that it is only by maintaining this ground that we can do our sacred work.   For the present we may suffer while we endeavor to maintain a good conscience, and in all things to live honestly; but we have no doubt, that ere long, God will vindicate the course we have pursued."

The Presbytery resolved to appoint no delegates to the approaching meeting of Synod, but appointed James Smythe, the commissioner to deliver the resolutions memorialed to Synod.

About February 1st 1870, the plaintiffs, and about eighteen other persons, voluntarily and causelessly seceded from the corporation, leaving defendants in possession of the church property; the plaintiffs formed another organization and have held their services in a hall on Norris street.

2. They denied that Steed was an elder, or that any of defendants were, or had been, since February 1st 1870, members in good standing in the congregation; Steed, who had been an elder in the congregation to July 1868, ceased to attend its services.

4. They admitted that the Synod was the chief legislative authority and supreme judicature of the denomination, but denied that it had appellate jurisdiction in all cases, or original jurisdiction where it saw fit to assume it over the members of the denomination, or any, except as conferred by the laws and constitutions before referred to; they denied that every person as a condition of becoming a member of the denomination, vows subordination to the Synod, but averred that a member "vows due subordination in the Lord to the authority of the Synod."

6. They denied that the Reformed Presbytery of Philadelphia had ever dissolved its connection with the Synod; since June 12th 1868, that Presbytery had sent no delegates to Synod, and the Synod at Cedarville, Ohio, on the 20th of May 1869, wrongfully

declared the officers and members of Presbytery out of its jurisdiction and thereby prevented the Presbytery from thereafter sending any delegates to Synod; the Presbytery had always acknowledged its due subordination to Synod, and never denied its rightful authority nor acted independently of it, except where the law of the church required Presbytery so to act.

7. Synod declared the Presbytery out of its jurisdiction, but the act was *ultra vires* and void; they denied that Synod ever recognised plaintiffs as the Fifth Congregation, except by entering on its records reports from the Second Presbytery in which plaintiffs are styled such; the judicial determination of membership in a corporation was not within the jurisdiction of Synod and Second Presbytery, and their recognition of plaintiffs was of no effect. Synod enacted that the Second Reformed Presbytery should be designated The Reformed Presbytery, and Synod had the right to confer any name on the Presbytery; but the new name did not make the Second Presbytery the legal successor of The Reformed Presbytery of Philadelphia.

8. They admitted that the defendant McMunn, at the annual congregational meeting of 1870, offered the resolutions (Exhibit C, hereafter given), their consideration was postponed to an adjourned meeting on the 11th of January 1870, when the defendant McAuley offered a substitute (Exhibit D, hereafter given) which was unanimously carried. At the annual congregational meeting of 1871, McAuley presented the report from the session (Exhibit E, hereafter given), which was approved and the resolutions of January 11th 1870 indefinitely postponed. They averred that the congregation never resolved or attempted to form a union with any denomination except the Reformed Presbyterian Church in North America.

9. Defendants and those associated with them numbered more than four hundred; the plaintiffs' party numbered twenty-nine. Defendants supported the action of June 12th 1868, of the Reformed Presbytery of Philadelphia, heretofore mentioned; they denied that they had refused all subordination to the Synod, and averred that they "always have been and now are in due subordination in the Lord to the authority of that Synod." They denied that the secession of the plaintiffs was for the reasons mentioned in the ninth paragraph of the bill; all the plaintiffs but Kerr were at the annual meeting in January 1870; no one of them voted against McAuley's substitute.

10. They admitted that the plaintiffs and their adherents were received by the Second Reformed Presbytery as the Fifth Reformed Presbyterian Congregation and have maintained a congregational organization, their connection with that Presbytery and through it with the Synod.

11. They denied that the persons named in the eleventh para-

[McAuley's Appeal.]

graph of the bill are the trustees of the Fifth Presbyterian Congregation, but they admitted those persons were elected at the hall on Norris street, trustees of the congregation organized . by the plaintiffs, &c. Notice was not given from the pulpit of the church on York street, nor was the election held in the church, nor were the persons elected recognised by the Session as being in communion with the church, nor were the persons elected members of the said congregation.

12. They denied that they had withdrawn from the Reformed Presbyterian Church of North America and the jurisdiction of Synod, and averred that Synod had sought wrongfully to thrust them out.

13. They adhered to and maintained the system of religious principles of the Reformed Presbyterian Synod of North America, and have always complied with the terms of communion of the Reformed Presbyterian Church of North America.

14. They denied the allegations in the fourteenth paragraph of the bill.

16. They denied that McAuley and other of defendants unlawfully exercised the offices of minister and elders respectively, and averred that they had been regularly ordained and installed to their respective offices in the congregation, that they had never been deposed nor their connection with the congregation ever severed.

17. They averred that the other defendants were lawfully exercising the office of trustees.

They admitted the allegations of the second, third, fifth and fifteenth paragraphs of the bill.

The following are exhibits referred to in the answer:

Exhibit C.—Copy of resolutions offered by defendant McMunn at congregational meeting on 3d of January 1870.

Whereas, we believe the Word of God enjoins an increasing love for, and unity among Christians :

Resolved, first, that we are in harmony with the great Union movement, in progress in our own land, of Presbyterians of a common faith on a common standard, and that on the basis recently adopted by the Old and New School Presbyterians, we can most heartily agree.

Resolved, that we believe it would be more for the glory of God, the extension of His kingdom, and our own welfare as a congregation, to have ecclesiastical fellowship with the church now formed by this union, the General Assembly of the Presbyterian Church in the United States of America.

Resolved, that having the fullest confidence in the session and board of trustees, we leave this entire matter for further action with them; and hereby give them the authority and full power to act in the premises, in any and all matters arising out of their

efforts, either of reconciliation, or in making an ecclesiastical fellowship as above indicated.

Resolved, that it never was, and is not now, the desire of either officers or members of this congregation, to change or modify our forms of worship, and that no steps shall be taken by us, either to relinquish our faith, or change, in any way, our forms of worship.

Exhibit D.—Whereas, it is our duty as followers of the Great Head of the Church, the Blessed Peacemaker, in all things to walk according to his commandments, to do all in our power to heal divisions, to prevent discord, to live in harmony with all his elect people, to love one another, to endeavor to keep the unity of the spirit in the bond of peace, to seek the peace of Jerusalem, beholding how good a thing it is for brethren to dwell together in unity, and that a blessing rests on the peacemaker; therefore,

Resolved, That any further action on the resolutions now before the meeting, is hereby for the present postponed, and that in order to obtain a full and correct vote of every member of the congregation on the subject of the resolutions before the meeting, the session is hereby instructed to adopt such a plan as shall, in their wisdom, be best adapted for this purpose, and receive from each and every member, in accordance herewith, his and her vote on the subject.

Resolved, That, in order to greater satisfaction, the session in the discharge of this duty shall preserve a written record of each vote so taken, for, or against, or otherwise.

Resolved, That on the completion of their work, which is to be done at as early a day as practicable, the session is hereby authorized to call a congregational meeting, announcing its object from the pulpit on the Sabbath preceding, to hear their report, and to take such action on it as may be deemed proper in accordance therewith.

Exhibit E.—The session would respectfully report, that, regarding the matter referred to them by the congregational meeting of January 11th 1870, they have consulted thereon, but proceeded to no action, and recommend the adoption of the following resolution:

Resolved, That the whole matter referred to in the papers, placed in the hands of the session by the congregational meetings of January 1870, is hereby indefinitely postponed, and the action of the session be approved.

A replication was filed; A. H. Gross, Esq., appointed examiner, and George T. Bispham, master.

After testimony had been taken by the examiner, and the case heard before the master, he reported the following facts as found by him:

In 1849 the Fifth Reformed Presbyterian Church was organized

as a constituent part of a well known existing ecclesiastical body called the Reformed Presbyterian Church of North America.

The Reformed Presbyterian Church consists of congregations—composed of individuals and immediately governed by pastors and ruling elders; of Presbyteries—composed of the minister and ruling elders of congregations; and of a General Synod—composed of delegates from the Presbyteries. The General Synod is the supreme governing body in the church, both legislative and judicial. Presbyteries are constituted by, and are subordinate to Synod. Each Presbytery comprises several congregations, or (more properly speaking), sessions of congregations.

Whether or not Synod is self-existent, and to what extent it has original jurisdiction, and whether its appellate jurisdiction extends to all cases, are questions which were argued before the master, and which will be noticed (as far as necessary), hereafter, when the action of Synod in regard to the present congregation comes to be discussed.

The Reformed Presbyterian Congregations of the city of Philadelphia appear to be five in number. Of these two—the Second and Fifth—were formerly attached to the Philadelphia Presbytery; the remaining three—namely, the First, Third and Fourth—were' attached to and constituted the Second Presbytery of Philadelphia.

Some time prior to the Synodical Session (held in Pittsburg) of 1868, dissensions had arisen in the First Church into the cause and character of which it is not necessary to enter. They resulted in the suspension of Dr. A. S. M'Murray and Mr. Guy, and in an appeal by these gentlemen, in the first instance to the Presbytery, and afterwards to General Synod, in May 1867, the matter was brought before Synod, by which body the following resolutions were adopted:

Resolved, That the act of suspension, pronounced by the session of the First Reformed Presbyterian Congregation of Philadelphia on Dr. A. S. M'Murray and Mr. Robert Guy, be, and the same is hereby revoked.

Resolved, That the joint action of the session and board of trustees of the First Reformed Congregation of Philadelphia, in disfranchising or declaring illegal the votes of one hundred and twenty-seven members, or adherents thereto, who voted at the last annual election for trustees in said congregation without issuing a citation on them, or allowing them a hearing, is contrary to the good order of the laws of God's house, be and the same is hereby declared illegal and of no effect.

Resolved, That the whole matter pertaining to the difficulties existing in the First Reformed Presbyterian Church of Philadelphia, be referred to a commission of General Synod, to be appointed by the moderator, consisting of four ministers and three ruling

[McAuley's Appeal.]

elders, who shall be clothed with Synodical powers, and have authority to issue the whole case.

Resolved, That this commission, of whom any two ministers and any one ruling elder shall constitute a quorum, shall meet in the First Reformed Presbyterian Church of Philadelphia, on the — day of June 1868, at 3 o'clock in the afternoon, and shall continue their sessions from day to day, or by adjournment from time to time, until they shall have investigated and issued the whole case.

Resolved, That the session of the First Reformed Presbyterian Congregation of Philadelphia, consisting of the Rev. Dr. T. W. J. Wylie, moderator, and Messrs. George H. Stuart, A. S. M'Murray, Robert Guy, James Grant, J. P. Smythe, W. J. Chambers, William Ray, members, be and they hereby are suspended and restrained from the exercise of all judicial functions in any matter or matters pertaining to the present difficulties in said congregation, or considering and issuing in their judicial capacity as a session, any case relating to said difficulties.

Resolved, That the Philadelphia Reformed Presbytery, be and they hereby are restrained and prohibited from considering or issuing any case now pending before them, or that may hereafter be brought before them, relating to the existing difficulties in the First Reformed Presbyterian Congregation of Philadelphia.

Resolved, That the decision of the commission, subject to the revision of the General Synod, at its next regular meeting, shall be final, and none of the parties shall plead or be impleaded either in Session or Presbytery, in any of the matters connected with, or arising out of the present existing difficulties, until such review shall have been made, and the disabilities imposed above in regard to the exercise of judicial functions shall have been removed.

Resolved, That all the papers presented to General Synod on the subject be referred to the Synodical Commission to be appointed as above.

This action of Synod has thus been set forth *in extenso*, as it is supposed to furnish a justification for the action of the Presbytery, which is about to be noticed.

This Synodical action was reported to the Reformed Presbytery of Philadelphia, by its delegates, and shortly afterwards, to wit, on June 12th 1868, the Presbytery passed a series of resolutions to the following effect:

[The report then sets out the proceedings as stated in the first paragraph of the answer, including the Exhibits.]

It is an admitted fact in the cause that the action of Presbytery above set forth was approved and supported by the defendants and their party; and it may also be here stated that after the passage of the above resolutions, no delegates were sent by this Presbytery to Synod, and no Presbyterial reports were made.

The next step in the history of the case is the action of the Synodical commission.

This commission met in Philadelphia on June 17th 1868, and continued in session until June 20th 1868.   On this last day they passed certain resolutions; of which only two need be stated. They are as follows:

Resolved, That the Reformed Presbytery of Philadelphia, having by its own act declined the authority of the General Synod of the Reformed Presbyterian Church, and withdrawn from its jurisdiction, the officers and members thereof are hereby declared to be without the jurisdiction of General Synod and this commission.

Resolved, That such officers and members of other congregations, namely, the Second and Fifth Congregations of Philadelphia, and the vacant congregations of Milton and Ulster, who may not identify themselves with the act of secession of the Philadelphia Presbytery, but avow their adherence to the General Synod of the Reformed Presbyterian Church, be declared to be the Second and Fifth Congregations of Philadelphia, and the congregations of Milton and Ulster, under the care of General Synod; and liberty is hereby given them to place themselves under the care of the Second Presbytery of Philadelphia, and that Presbytery is hereby, upon their application, authorized to receive them.

The commission then adjourned.

At the next session of Synod, which was held at Cedarville, Ohio, in May 1869, the memorial prepared by the Philadelphia Presbytery, and the resolutions passed by them, were laid before Synod.   The Synodical Commission also made its report.

The Synod appears to have taken no direct action upon the resolutions of Presbytery and the memorial.

The report of the Synodical Commission was however adopted, and its action approved; and Synod declared in substance that the Presbytery was out of its jurisdiction, and provided that such congregations, or parts thereof, as did not adhere to the seceding Presbytery might put themselves under the care of the Second Presbytery, which was thenceforward to be known as "The Reformed Presbytery of Philadelphia."

The next fact in the controversy is the action taken at the annual meeting of the Fifth Congregation in January 1870, whereat the defendant (McMunn) introduced certain resolutions (which had been previously approved at a meeting of the board of trustees), whereof Exhibit C. to the answer purports to be a copy. Some difference of testimony exists as to whether the preamble to these resolutions, as it was first written, contained a recital to the effect that the Fifth Congregation was not in connection with any organized religious body.   Be this as it may, the consideration of these resolutions was postponed until January 11th 1870, and subsequently the matter was postponed indefinitely.   There is no evi-

dence that the congregation has attempted to form a union with any other religious denomination. It is, however, as has been already stated, an admitted fact in the cause, that the defendants, and their party in the congregation, approved and supported the action of the Presbytery which has already been set forth.

They continued to send delegates to the Presbytery, and the defendant, McAuley, as minister, continued to sit in the Presbytery.

In February 1870, the complainants and some other members of the congregation, associated themselves together as a church organization, and petitioned the Second Presbytery to receive them as the Fifth Reformed Congregation. This petition was granted; and from that date they have maintained a congregational organization, and their connection with the said Presbytery, and through that body with the General Synod.

They are reported *as* such congregation by the said Presbytery, and these reports are duly received by Synod in the usual way.

An election of trustees of the plaintiffs' church was held in January 1871, as is stated in paragraph 11 of the bill. In the answer, however, it is denied that this election conferred any title as trustees upon the parties so elected, because:

1. Notice thereof was not given from the pulpit in the church, to wit, the church on York street west of Coral street.

2. The said alleged election was not held at the aforesaid church.

3. The electors voting thereat were not, at the date of the alleged election, members of the said corporation.

4. The persons alleged to be elected thereat have not been, and are not now, recognised by the session of this congregation as being in full communion with the church.

5 The persons alleged to be elected thereat were not then, and are not now, members of the said corporation.

The church buildings in York street are in the possession of the defendants, and the bill is filed in order to recover possession of the same.

The master, after stating some general legal principles and considering a preliminary question, proceeded:

* * * " The next question for consideration is, whether the defendants have diverted the property of the congregation from its legitimate uses, in the manner above described; in other words, whether they have unjustifiably severed the connection between the congregation and the ecclesiastical organization of which it is a part. The complainants say that they have, and they further say, that this severance has been effected by the withdrawal of the Presbytery (to which this congregation was subordinate) from connection with Synod, and by the adoption of this presbyterial action by the defendants." * * *

He further discusses the facts and the law and says:

[McAuley's Appeal.]

" Upon the above review of the action of Presbytery, the master is of opinion that it goes very far towards establishing the position contended for by the complainants." * *· *

After considering the proceedings of the Synod, the other proceedings of the defendants, &c., the master decided that the plaintiffs were entitled to a decree in their favor.

He reported the following as a proper form of decree.

1. The complainants and the congregation associated with them are hereby declared to be the Fifth Reformed Presbyterian Congregation, in the District of Kensington, in the county of Philadelphia.

2. The defendant, A. G. McAuley, is hereby enjoined from exercising the functions of minister within the church buildings described in the bill.

3. The defendants, James Dittie, Robert H. McMunn and Thomas McKeever, are hereby restrained from exercising the functions of elders within the said church buildings.

4. The defendants, James Dittie, Samuel Lyons, Andrew Loughridge, Nathaniel Dickie, Joseph Caldwell, Robert H. McMunn, Robert Graham, Samson McDowell and Robert Spratt, are hereby restrained from exercising the functions of trustees of the aforesaid congregation, and from dealing with the property thereof in any way.

5. The defendants are hereby required and directed to deliver the property of the said congregation in their possession to William Reynolds, William Steen, John Glenn, James Walker, Thomas Miller, John Buchanan and James Creighton, or their successors as trustees of the said congregation.

Exceptions were filed to the report of the master. The exceptions were dismissed, the report confirmed and decree made in accordance with the report.

The defendants appealed to the court in banc. In a number of specifications they assigned the decree for error.

*C. S. Patterson* and *Porter*, for appellants.

*J. S. Price* and *F. C. Brewster* (with whom was *E. S. Boudinot*), for appellees.

The arguments were so extended that it is impracticable to appropriate sufficient space in the report of this case to present even a synopsis of them.

Mr. Justice GORDON delivered the opinion of the court, October 11th 1875.

On the 13th of March 1850, the Fifth Reformed Presbyterian Congregation of Philadelphia was incorporated by the Court of Common Pleas, in pursuance of the Act of October 13th 1840.

[McAuley's Appeal.]

By the second section of the Articles of Incorporation the corporate powers were vested in those subscribing thereto, " and such others, being citizens of this Commonwealth, as shall hereafter become members of said congregation, and who adhere to and maintain the system of religious principles declared and exhibited by the Reformed Presbyterian Synod of North America, of which the Reverend Doctors Wylie and Crawford are now officiating ministers."

The real estate, which is the subject-matter of the present controversy, was conveyed to the corporation, March 14th 1850, " to and for the only proper use and behoof of the said congregation, their successors and assigns for ever."

It is apparent from the above statement, that, at the time of the execution of the above-mentioned deed, the Fifth Congregation formed a constituent part of the Reformed Presbyterian Church of North America, and, as such, was subordinated to the General Synod as the supreme judicatory of said church; and that the franchises and property of the corporation were to be held and used only for the benefit of such persons as should " adhere to and maintain the system of religious principles delivered and exhibited by the Reformed Presbyterian Synod of North America." Of course " the system" thus referred to was one then ascertained and promulgated, and by which the General Synod was as much bound as the humblest member of the church. Now, the plaintiffs, who represent a' small minority of the congregation of the Fifth Church, and who seceded therefrom on or about the 1st of February 1870, claim that they are, *de jure*, the Fifth Congregation, and that the defendants, representing the majority, now in possession of the church property, wrongfully withhold the same from them, and also unlawfully hold and exercise the corporate franchises to and for the use and benefit of the said majority. This charge is based upon the allegation that the defendants have, voluntarily and without just cause, withdrawn from the Reformed Presbyterian Church of North America, and from the jurisdiction of the General Synod.

If this be so, the prayer of the plaintiffs must be granted; the defendants, in such case, have no standing in court, for where a congregation has been organized and holds its property as a constituent part of any particular.religious denomination, or in subordination to the government of any particular church, it cannot, without just cause, sever itself from such connection or government. If it does so, it necessarily forfeits its rights and property to those of the organization who maintain the original status: Winebrenner *v.* Colder, 7 Wright 244; Schnorr's Appeal, 17 P. F. Smith 138. The justice of this rule becomes apparent when we consider that without it minorities could have no protection, but must be constantly subjected to the caprice of majorities, with-

out regard to the terms and conditions of the original compact. But the burthen is upon the plaintiffs to show us that the defendants, voluntarily, by their own act, and without sufficient cause, did so depart from and renounce their connection with the general organization, with which, at the time of their incorporation, they were identified, and did trespass upon and invade the charter-rights of the minority by attempting to pervert the trusts, in that charter contained, to unlawful uses.

Let us then see upon what the plaintiffs rely to support their position; to disfranchise the defendants, and to dispossess them of a valuable property which they bought and paid for.

So far as material to the subject in hand, the facts are about as follows: On the 12th day of June 1868, the Reformed Presbytery of Philadelphia, to which the Fifth Church was attached, passed *inter alia*, this resolution : " That we regard the proceedings of the Synod to be contrary to the standards of the Reformed Presbyterian Church, to its book of discipline, to its terms of communion, to its formula of ordination, to numerous acts upon its records; and that a true and faithful adherence to the principles of the church, and especially our paramount obedience to the Lord Jesus Christ, the great and only King and Head of the Church, will not allow us to recognise the unconstitutional, disorderly, arbitrary and injurious action of said Synod as aforesaid, and we do hereby suspend our relations to said Synod until such action be revoked, or until we obtain further light, and in the meantime we remain in the Reformed Presbyterian Church, maintaining her organization," &c.

In explanation of the above resolution we may be permitted to say, that the difficulties which produced it arose from the alleged unwarranted suspension, by the Synod, of a member and elder of the First Church, and its illegal interference with and disregard of the constitutional rights and jurisdiction of the above-named Presbytery. Now if these charges be correct, then by the standards and teachings of the church, this Presbytery was not only justified in its action, but it was its duty to take the stand it did, in order to protect the constitutional rights of the churches under its charge. Upon the correctness of these complaints, however, we are not now called upon to pass, as we do not consider them as involved in the issue before us. The resolutions above referred to, with an accompanying protest, were duly presented to the General Synod at its annual meeting, at Cedarville, Ohio, in May 1869, and thereupon, that body, in answer thereto, passed the following resolutions, among others, to wit : " That the Reformed Presbytery of Philadelphia, having by its own act declined the authority of the General Synod of the Reformed Presbyterian Church, and withdrawn from its jurisdiction, the officers and members thereof

are hereby declared to be without the jurisdiction of the General Synod."

"That such officers and members of the other congregations, viz. : The Second and Fifth Congregations of Philadelphia, and the vacant congregations of Milton and Ulster, who may not identify themselves with the act of secession of the Philadelphia Presbytery, but avow their adherence to the General Synod of the Reformed Presbyterian Church, be declared to be the Second and Fifth Congregations of Philadelphia, and the congregations of Milton and Ulster, under the care of General Synod, and the liberty is hereby given them to place themselves under the care of the Second Presbytery of Philadelphia, and that Presbytery is hereby, upon their application, authorized to receive them."

It will thus be seen that the suspending resolutions of the Presbytery were promptly met by the exscinding resolutions of the Synod, by which the Presbytery was put without the pale of Synodical communion, and its churches dissolved. We say its churches dissolved; for it will be observed that no provision was made for them as such, but only for *such officers and members* thereof, as might not identify themselves with the alleged secession of the Philadelphia Presbytery. Thus, without notice, without trial, without cause shown, and, indeed, without offence, the Fifth Congregation is literally blotted out, and its rights and franchises forfeited. It is true that the defendants admit that they supported the action of the Presbytery, as taken on the 12th of June 1868, but, at the same time, they deny that they refused proper obedience to the Reformed Synod; on the contrary, they allege that they always have been and are now in due subordination to the authority of that body. These allegations we must assume as true, nothing having been shown to falsify them, and it will certainly not be pretended by any one acquainted with the Presbyterian polity, that these persons could be unchurched by an arbitrary decree of the Synod, without notice or trial, even supposing the admitted act to have been contumacious and worthy of censure. It follows, therefore, that the defendants, so far as appears from the records of this case, are members in full and regular standing in the Reformed Church, and as such are entitled to all the rights, and are amenable to the lawful rules and regulations of the General Synod, whatever may be the legal status of the body of which they are corporators. Then, as to the congregation in its general and corporate capacity, nothing has been shown to indicate that it does not adhere in spirit and letter to the "system of religious principles declared and exhibited by the Reformed Presbyterian Synod of North America." As a congregation, it was guilty of no insubordination.

It is true, it was represented in the Presbytery that passed the offensive resolutions, but over its representatives it had neither

power nor control, they being amenable to the Presbytery and Synod alone. It is not to be forgotten that a Presbyterian congregation does not select its delegates to the higher courts of the church *pro re nata*. The pastor is not strictly the representative of his charge, except in so far as he may judge it proper so to act, for he is not a Presbyter by virtue of his office as pastor of a particular charge, but by virtue of his ordination to the gospel ministry ; he is as much entitled to his seat in the Presbytery, without having a charge, as when he has one.

So, the lay representative, who must be an elder, is selected by the session. But as this session, an inferior church judicatory, is composed of elders, elected for life or during good behavior, it follows that the congregation has no voice in the selection of such representative, and that he may or may not, according to circumstances, represent the sentiment of the church. Obviously, therefore, the congregation is powerless and passive in the hands of its church courts, and cannot be justly charged with the acts of its delegates in either the Presbytery or Synod, because in these bodies alone resides the power to call such representatives to an account for any unlawful or contumacious acts, which they may commit in their representative capacity.

None knew these things better than the plaintiffs themselves, and it was doubtless in view of this that the majority of the congregation was charged in the eighth paragraph of the bill with favoring the resolutions offered by Mr. McMunn, at a congregational meeting on the 3d day of January 1870, which favored a union with the General Assembly of the Presbyterian Church. But the facts are that those resolutions were, at that meeting, referred to the session, and that body, after holding them until the 11th of January 1871, reported an indefinite postponement. This action then, so far from supporting the charge of the plaintiffs, meant, if anything, that the Fifth Congregation was not yet prepared to sever its connection with the Reformed Church. Again, by the organic law of the Reformed Presbyterian Church, Dr. McAuley continues to be the pastor, and Messrs. Dittie, McMunn and McKeever continue to be members of the session of the Fifth Church. It is not denied that they were duly elected and ordained. If they continue not as such, where is the warrant of their deposition ? Will any one pretend to say that the excision of the Philadelphia Presbytery could of itself work the deposition of officers who had, previously to that time, been solemnly called and set apart to their several positions under the sanction of laws and ordinances much more ancient and venerable than the Synod itself? Unless, therefore, the congregation of the Fifth Church was legally dissolved, its organization remains intact. We have already shown that there was no cause sufficient to produce such an effect. That the decree of the Synod which sought to accom-

plish this result was unlawful and revolutionary, will the more fully appear upon consideration of its legitimate powers. These are of two kinds, legislative and judicial. Under the first, it might have dissolved the Presbytery of Philadelphia and assigned its churches to some other existing Presbytery or to such new one as it might choose to erect. Under the second of these powers, it might, for proper cause and in due form, depose any of its presbyters or dissolve any of its churches and re-organize them. We may concede that the first, in the case mentioned, might be exercised arbitrarily, for that involves but a matter of church polity which, from its very nature, must rest largely in the discretion of the superior court; but the exercise of the second in such manner, involving, as it necessarily must, important civil rights, cannot be tolerated. Had the synodical decree, which we are asked to enforce, been founded upon some semblance of legal process, it might have been sustained, but as it is wholly without such foundation, it must be regarded as nugatory. As has been well observed by Gibson, C. J., in the case of Commonwealth *v.* Green, 4 Whart. 601, "a judicial sentence without notice or hearing, is contrary to the cardinal principles of natural justice, and consequently void."

If, on the other hand, we treat this decree as a legislative act, it is open to two objections : first, if, as is contended, it operates to forfeit the property and franchises of the defendants, it partakes of the nature of a judicial sentence, and is for that reason inoperative ; second, as this congregation was part of a homogeneous body, the act of excision was *ultra vires.* If such power resides in the Synod, it has not been shown to us. So far as we can discover, that body has no more power to exscind a church than the Pennsylvania legislature has to exscind a county. The case has no points of similarity to that of the Commonwealth *v.* Green, for there the plan of union was treated as a merely temporary arrangement. Says Gibson, C. J. : "It was obviously a missionary arrangement from the first, and they who built up Presbyteries and Synods on the basis of it, have no reason to expect that their structures would survive it, or that Congregationalists might by force of it gain a foothold in the Presbyterian Church in spite of presbyterial discipline. They embraced it with all its defeasible properties plainly put before them ; and the power which constituted it might fairly repeal it, and dissolve the bodies that had grown out of it, whenever the good of the church should seem to require it."

Thus the union spoken of was a compact between bodies differing essentially in their ideas of church government and doctrine, and was formed for the occasion only, and designed to serve but for the particular purposes of its creation. When the churches were weak and

27 P. F. SMITH—27

widely scattered over a new and thinly-settled territory, there was a prime necessity moving to a union of action, without regard to the minor ideas of church polity and doctrine; but when this necessity disappeared, in consequence of the growing strength of the several organizations—when each acquired power ought to be self-supporting, and to feel that it was able to fulfil its mission, and promulgate its own peculiar ideas, without extraneous help— then the dissolution of the original compact followed as a necessary consequence. The case in hand presents a totally different aspect. The Fifth Church was erected under no such temporary arrangement, but as an integral part of the general organization; it was an inseparable constituent of the ecclesiastical body; it had a direct, inherent and organic interest in that body, and it was designed to be for ever a part of it. It might, indeed, forfeit that right, but that forfeiture must be made to appear by a regular judicial decree; no mere legislative act could produce such a result. Then let us recur to the suspending resolution of the Presbytery, and consider its effect. We may concede, for the sake of the argument, that the Fifth Church assented to that resolution, and was involved in its consequences. That act did not operate to sever the connection of either of these bodies from the general organization; neither was it intended so to do. "Suspension" is "temporary" cessation; delay; intermission; stay: Worcester's Dictionary. It but intermitted the relations of the Presbytery and Church with the Synod, but it worked no dissolution of the organic connection. It but placed these bodies within the disciplinary and corrective power of the superior court, and had it exercised its constitutional powers in this direction, the difficulty would have been settled within the church, or the rebellious bodies would have been obliged to place themselves in such a position as would have entitled them to no redress from the civil courts.

But passing this, we may proceed one step further, and analyze the synodical decree itself, admitting, at the same time, its efficiency for the purposes of argument. It will be observed that it, in terms, does not import a dissolution of either the Presbytery or its churches, but simply puts them out of the jurisdiction of the General Synod, and provides only for those officers and members of the excluded churches, who might not identify themselves with the alleged act of secession.

It professes to treat the presbyterial resolution as an act or proposition of secession, and as such accepts and acts upon it. Looking at the matter in this light, it amounts to a proposition on the one part to dissolve the compact of union, and an acceptance thereof on the other. If we are not correct in this, then the question recurs, why did the Synod not make provision for the churches within the bounds of the Philadelphia Presbytery? As we have already shown, these churches, as ecclesiastical organiza-

tions, were left intact; pastors, elders and members maintain their original status, and the congregations with which they are connected have been convicted of no act of insubordination which could justly subject them to the reprehension of the Synod. If it be said, the Fifth Church assented to the contumacious action of the Presbytery, the question occurs, when and how did it so assent? Was it before or after the passage of the exscinding resolution? If before, in what did that act consist? What charges might the Synod have tabled against it? That its presbyters had voted in Presbytery for the offensive resolutions? The answer to such a charge, by the congregation, would have been: "For the conduct of these men in that court the church was not answerable; it had no power over them; they were within your jurisdiction, and if they, as presbyters, offended, you are the power to whom they must account. The congregation, as such, has but one constitutional method by which it can express itself, and that is by congregational meetings regularly called; if there be such an expression, let it be shown, but if not, your charges are groundless and impertinent." If, however, this assent was subsequent to the Synodical action, then it resulted from that action, for, by it, the Fifth Church was shut out from Synodical communion, and nothing was left for it but to adhere to its original Presbyterial connection. Certain it is, had this congregation applied for admission to any of the Presbyteries that adhered to the jurisdiction of Synod, it would not have been received, for the decree had provided, not for this organization, but for a new one, to be formed from those members who might secede from it. All this, however, amounts to nothing, as the Synod did not stop to ascertain whether the individual churches assented to or dissented from the Presbyterial action, but proceeded at once with the work of elision, looking to naught beyond the Presbyterial protest. The secret motives which prompted this alacrity to dissolve this ancient bond of union are not for us to explore, but the manner of its doing obliges us to regard the act as, in its legal bearings, similar to the decree of the General Assembly of the Presbyterian Church, made in 1837, exscinding the four synods.

In that case the sentence of excision was treated as an ordinance of dissolution, which left the several congregations free to attach themselves to either of the resulting organizations, or to remain independent, as might seem to them best: Presbyterian Congregation v. Johnston, 1 W. & S. 9. Chief Justice Gibson, who delivered the opinion of the court in the above-named case, after stating that no particular Presbyterial connection had been prescribed by the founders of the church or by its charter, observes: "And if such connection had been prescribed, there has been no adhesion to a connection essentially different, and the breaking up of the original Presbyterian Confederation has released this con-

[McAuley's Appeal.]

gregation from the duty of adhering to any particular part in exclusion of another." The congregation, referred to in this opinion, by its own act, had withdrawn itself from the Presbytery of Carlisle, to which it had been for many years attached, and, for the time, assumed an independency. We see, however, though the act of secession was of its own motion, yet it was therein justified, because of the exscinding act of the General Assembly, though it was in connection with neither of the exscinded synods. This doctrine was approved in the case of the Lutheran Congregation *v.* St. Michael's Church, 12 Wright 20; and so we must take it as the settled law of Pennsylvania. Giving, then, the decree of excision of the Reformed Synod its most efficient latitude, it amounts to but a dissolution of the original compact of union, which leaves the several churches free to seek their own connections, or to arrange themselves in such aggregations as to them may seem meet, provided they do not radically depart from the faith or doctrines under which they were organized.

The decree of Nisi Prius is reversed, and the bill of the plaintiffs is dismissed at costs of plaintiffs.

Chief Justice AGNEW and Mr. Justice SHARSWOOD dissented.